AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of Californ

**FILED**
CLERK, U.S. DISTRICT COURT

11/06/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: CGM DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

11/6/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: JB DEPUTY

United States of America

v.

RICARDO VIVAR,

Defendant(s)

Case No. 2:23-mj-05749-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 23, 2023 through June 15, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A), 2(a) | Engaging in the business of dealing in firearms without a license |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Brandice Olmos*
_____
*Complainant's signature*

Brandice Olmos, ATF Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   November 6, 2023
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Joel Richlin, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA:_ Alix McKenna (x6166)

**AFFIDAVIT**

I, Brandice Olmos, being duly sworn, declare and state as follows:

**I.   INTRODUCTION**

1.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since August 2021.  Prior to being employed as an ATF Special Agent, I was a student intern for the United States Marshals Service for approximately one year.

2.    I graduated from Eastern Michigan University with a Bachelor of Arts degree in Criminology.  I also graduated from California Baptist University with a Master of Arts degree in Forensic Psychology.  Following my education, I completed the ATF's Special Agent Basic Training and the Department of Homeland Security's Criminal Investigator Training Program.  I have received training in the trafficking of firearms and controlled substances, as well as the various means and methods by which traffickers use in furtherance of firearms and drug transactions.  I have also participated in multiple firearms and drug trafficking investigations involving the illegal sales, transfer, and possession of firearms and controlled substances.  Additionally, I have participated in many aspects of firearms and gang investigations, including conducting surveillance and the use of confidential informants and undercover agents to make controlled purchases of controlled substances and/or firearms.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, Reyna MONTANO ("MONTANO") and Ricardo VIVAR ("VIVAR"), for engaging in the business of dealing in firearms without a license, in violation of Title 18 U.S.C. §§ 922(a)(1)(A), 2(a).

4.    This affidavit is also made in support of a search warrant for the following:

        a.    The person of MONTANO, as described more fully in Attachment A-1; and

        b.    The person of VIVAR, as described more fully in Attachment A-2.

5.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance) and 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. §§ 371 (conspiracy), 922(g)(1) (prohibited person in possession of a firearm), 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); and 933 (firearms trafficking) (collectively the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrants, and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Beginning in or around January 2023, an ATF Confidential Informant ("CI") provided information concerning a potential firearms and narcotics trafficker, later discovered by law enforcement to be MONTANO.  During four separate controlled purchases, MONTANO sold undercover officers (the "UCs") ten firearms, twelve rounds of ammunition, and approximately 1,366 gross grams of methamphetamine.

8.    Additionally, during three of the controlled purchases, law enforcement saw VIVAR present and assist MONTANO from a vehicle both inside and immediately outside the location where MONTANO sold the weapons and drugs to the UCs.  For instance, during a controlled purchase on June 9, 2023, MONTANO met with two UCs in an undercover location in Los Angeles (the "UC location") to sell them guns, told them she forgot one in the car, and then exited the UC location.  Surveillance units then saw her approach the driver's seat of a red Honda, and speak to VIVAR.  VIVAR placed a black colored object consistent with being a firearm in MONTANO's backpack before MONTANO walked back to the UC location.  After reentering the UC location,

MONTANO took a gun out of her backpack and sold three firearms and approximately one pound of methamphetamine to the UCs.

## IV. STATEMENT OF PROBABLE CAUSE

9.    Based on my own involvement in the investigation, including surveillance, my review of law enforcements reports, audio and video recordings, documented text messages and recorded phone calls, physical surveillance, discussions with the UCs working this case, discussions with a CI who previously worked with ATF, and discussions with other law enforcement officers involved in the investigation of this case, I am aware of the following:

### A.    MONTANO Is Identified as a Drug and Gun Dealer

10.   In or around January 2023, the CI[1] provided information to ATF special agents regarding a potential narcotics and firearms trafficker known by ATF, at the time, as "Reina" LNU. As described further below, "Reina" was later identified as Reyna MONTANO.  The CI explained to SA Olmos and Los Angeles

---

[1] The CI was working for law enforcement in return for monetary compensation but has since been deactivated due to a failure to stay in contact with agents.  The CI is a self-professed gang member and has previous convictions for assault, felon in possession of a firearm, possession of a weapon in prison, burglary, robbery, evasion, and assault with a deadly weapon.  The CI also worked for law enforcement in exchange of receiving favorable consideration in connection with an ongoing criminal case.  The information provided by the CI in this case has proven to be reliable and credible, and the information provided has been corroborated.  However, agents currently believe that after providing the information discussed in this warrant, he/she was not truthful with agents about how he/she spent relocation money.  Agents later learned that he/she was involuntarily committed pursuant to California Welfare and Institutions Code section 5150.  Additionally, he/she destroyed and/or disposed of two phones provided to him/her by agents, on or about March 16, 2023, and on or about April 5, 2023.

Police Department (LAPD) Task Force Officer (TFO) Steven Flores
that he/she had previously met an unidentified female, known to
the CI as "Reina," and later identified to as MONTANO.[2]  The CI
communicated that he/she used to engage in illicit activities
with MONTANO, prior to becoming an ATF CI.

**B.   On February 23, 2023, MONTANO Sold the UCs One Pound
of Methamphetamine**

11.   On or about February 20, 2023, per SA Olmos'
instructions, the CI contacted MONTANO at a phone number he/she
had for MONTANO, via a recorded line.  The CI inquired about
purchasing narcotics and/or firearms.  On or about February 21,
2023, MONTANO responded to the CI, and the two began discussing
future potential narcotics and firearms transactions.

12.   Based on law enforcements' review of documented text
messages and recorded phone calls,[3] the following occurred:

13.   Between February 21, 2023, and February 23, 2023, the
CI communicated with MONTANO.  Using coded language, the CI
asked MONTANO if she had firearms to sell to the CI's friend.
Unbeknownst to MONTANO, the CI's "friend" was an undercover
officer working with ATF.  MONTANO told the CI, via text

---

[2] Los Angeles Police Department task force officers compared
screenshots of MONTANO, captured during one of the undercover
operations described below, with images stored in law
enforcement databases and, using facial recognition software,
identified "Reina" as Reyna MONTANO.  An LAPD undercover officer
who met with MONTANO on February 23, 2023, reviewed photographs
of MONTANO from law enforcement databases and confirmed that
MONTANO was the same person, known by ATF, as "Reina."

[3] Over the course of this investigation, the majority of
MONTANO's communications were spoken in Spanish.  An undercover
officer involved in this investigation, who is fluent in
Spanish, reviewed the documented text messages and recorded
phone calls and translated MONTANO's conversations to English.

messages, that she had narcotics and firearms for sale.  The
messages were in Spanish, and I have discussed their contents
with a Spanish-speaking investigator.  Specifically, the CI
inquired about purchasing drugs and asked for "a whole", which
based on my training and experience means a pound.  MONTANO
replied and said it would be $1,100 for "shards", which based on
my training and experience means methamphetamine.  She also
offered to sell him/her firearms.  The CI and MONTANO agreed on
the price of $1,100 for the pound of narcotics.  MONTANO
mentioned that she had a revolver for sale for $1,200, but
ultimately stated they would discuss the sale of the firearms in
person.

14.  On or about February 23, 2023, based on my own
observations as a surveilling agent, two UCs met with MONTANO at
an ATF controlled location within Los Angeles County (the "UC
location").  MONTANO entered the UC location on foot and walked
with the UCs to a lounge area. MONTANO then sat on a couch and
removed a black backpack from her shoulder and placed it on top
of a couch footrest.  MONTANO took out a brown bag from the
backpack and then took out a clear plastic bag containing
methamphetamine.  MONTANO then sold the UCs approximately 453
gross grams (about one pound) of methamphetamine for $1,100.[4]
MONTANO began showing the UCs photographs of firearms on her
cellphone and discussed future firearms and narcotics
transactions with the UCs.

---

[4] On or about April 3, 2023, the DEA Southwest Laboratory
analyzed the methamphetamine purchased on February 23, 2023, and
determined the substance purity to be 99% +/- 6%.

   **C.   On March 15, 2023, MONTANO Sold the UCs Four Firearms, Nine Rounds of Ammunition, and One Pound of Methamphetamine**

   15.   Between February 23, 2023, and March 1, 2023, a UC and MONTANO coordinated a second meeting.  During this time, MONTANO requested that a UC communicate with her using the WhatsApp Messenger mobile application, and the UC complied with her instructions.  The UC captured their communications, which were in Spanish, and described their content to me.  I also reviewed images of the messages.

   16.   Based on law enforcements' review of documented text messages and recorded phone calls, the following occurred:

   17.   On or about February 28, 2023, a UC contacted MONTANO to arrange purchasing firearms and/or narcotics from MONTANO, with a planned transaction scheduled for March 1, 2023.  On or about March 1, 2023, MONTANO sent a video to a UC of a firearm that MONTANO was offering for sale, via WhatsApp Messenger. MONTANO and the UC agreed to meet at the UC location on March 1, 2023.  However, MONTANO never arrived for the arranged transaction.

   18.   On or about March 12, 2023, MONTANO contacted a UC, via WhatsApp Messenger, indicating she had two handguns for sale for $2,000.  MONTANO sent photographs of the two firearms to a UC.  MONTANO then asked a UC if he/she would also want to purchase methamphetamine, to which a UC responded that he/she would purchase one pound of methamphetamine for $1,100.  An undercover officer and MONTANO then arranged to conduct the transaction on or about March 15, 2023.  On or about March 13,

2023, MONTANO sent photographs of a shotgun and a rifle to a UC. On or about March 15, 2023, MONTANO sent a UC an additional photo of a shotgun and asked a UC if he/she was willing to purchase the shotgun and one of the rifles for $700 total.

19.  On that same date, at approximately 4:42 p.m., surveillance units witnessed MONTANO arrive at a UC location in a white four-door Chevy Impala.  The vehicle first parked in front of the UC location.  MONTANO then got out of the front passenger side of the vehicle, walked to the rear of the vehicle, and retrieved a large white trash bag from the trunk of the vehicle.  A UC asked MONTANO to drive the vehicle inside the UC location, to which MONTANO agreed.  Upon driving into the UC location, surveillance units saw a Hispanic male, later identified by law enforcement as Ricardo VIVAR,[5] occupying the driver's seat of the vehicle, where he remained for the duration of the controlled purchase.

20.  Once inside the UC location, MONTANO exited the vehicle, retrieved items from the trunk, and walked with the UCs

---

[5] On or about June 20, 2023, SA Olmos queried law enforcement databases and discovered the 2013, dark red Honda Civic, bearing California license plate 9DOG027, that was present during the June 9, 2023, deal described below, is registered to Ricardo VIVAR.  SA Olmos retrieved VIVAR's California Driver's License (CDL) and recognized VIVAR to be the individual who was driving the dark red Honda Civic on June 9, 2023.  SA Olmos then showed a UC, who was involved in the June 9, 2023 gun and drug transaction a photograph of VIVAR. The UC positively identified VIVAR as the individual who drove MONTANO into the UC location during a controlled purchase on March 15, 2023, and who was present outside the UC location during controlled purchases on June 9, 2023, and June 15, 2023. On or about November 2, 2023, a UC involved in the investigation, who is certified to operate the LA Country Mugshot database, queried screenshots of VIVAR, captured from video of the deal on June 9, 2023, and confirmed the identity of VIVAR.

directly to the lounge area. MONTANO then handed a UC a large white trash bag, which contained two firearms, a High Standard, Flite-King Deluxe Rib, 12 Gauge caliber shotgun, serial number 5832025, and a Marlin, Glenfield 25, 22-S-L-LR caliber rifle, serial number 71373222.  MONTANO retrieved two handguns from a white cosmetics pouch, an Amadeo Rossi, M88, .38 Special caliber revolver, serial number W233993, and a Taurus International Mfg., Inc., PT738 TCP, .380 ACP caliber pistol, Serial Number 05683F.  The narcotics were inside a clear plastic bag and wrapped inside a brown paper bag that MONTANO retrieved from a small blue bag.  A UC then purchased the four firearms, nine rounds of assorted ammunition, and approximately 457 grams (about one pound) of methamphetamine for $3,800 total.[6]  MONTANO and the two UCs then discussed future firearms and narcotics transactions.

> **D.   On June 9, 2023, MONTANO Sold Three Firearms and Another Pound of Methamphetamine to a UC**

21.  I know based on my review of reports and conversations with the UCs that between March 22, 2023, and June 9, 2023, a UC and MONTANO coordinated a third meeting, predominantly utilizing the WhatsApp Messenger mobile application.  Between March 22, 2023, and May 9, 2023, MONTANO sent the UC photographs depicting three different firearms for sale.  Between May 19, 2023, and June 9, 2023, MONTANO sent pictures of eight additional guns

---

[6] On or about April 3, 2023, the DEA Southwest Laboratory analyzed the methamphetamine purchased on March 15, 2023, and determined the substance purity to be 99% +/- 6%.

that she was offering for sale to a UC.  The UC captured these communications, which were in Spanish, and described them to me.

22.  Based on law enforcements' review of documented text messages and recorded phone calls, the following occurred:

23.  On or about June 8, 2023, MONTANO contacted a UC, via text message on WhatsApp Messenger application.  MONTANO sent a UC a photograph depicting four firearms.  The following day, on or about June 9, 2023, a UC replied to MONTANO's text message and asked about the cost of the firearms. MONTANO replied, via WhatsApp text messages, and indicated that she had four firearms available for a total of $10,000.  MONTANO also indicated that she would contact her supplier and see if the firearms could be picked up at a specific time.  During the time that MONTANO was waiting for a response from the supplier, she sent a UC another set of photographs depicting four additional firearms. MONTANO explained to a UC that she had the latter four firearms available and would be willing to meet a UC later that day.  A UC replied to MONTANO and agreed to buy the latter set of four firearms and also agreed to wait on the response of the supplier to possibly purchase all eight firearms that day. MONTANO also indicated that she was bringing methamphetamine with her to the arranged transaction in case a UC wanted to purchase it.

24.  On that same date, at approximately 3:45 p.m., an ATF surveillance unit saw MONTANO enter the UC location on foot while carrying a black-colored backpack.  Based on my review of surveillance footage and conversations with the UCs, I know that once inside the UC location, MONTANO reached inside the black

10

backpack, retrieved a smaller sized black bag, and placed the
smaller bag on a table. According to the UCs, MONTANO then told
a UC that she forgot one of the firearms in the car.

25.   MONTANO then exited the UC location, while carrying
the black backpack.  At this time, surveillance units saw a dark
red Honda Civic, bearing California license plate number
9DOG027, with the windows rolled down, drive towards the UC
location and park directly outside the UC location's bay door.
Surveilling agents saw MONTANO approach the driver's seat of the
dark red Honda and began engaging in conversation with Ricardo
VIVAR.  Shortly after MONTANO's approach, VIVAR placed a black
colored object, consistent with a firearm, inside MONTANO's
backpack.  MONTANO then closed the backpack and began walking
towards the UC location.

26.   MONTANO re-entered the UC location with a UC.  I know
based on my review of surveillance footage and conversation with
the UCs that once back inside, a UC emptied the contents of the
small black bag MONTANO had previously left on the table and
discovered two firearms, a Kimber, Stainless Ultra Carry II, .45
ACP caliber pistol, serial number KU26435, and a Polymer 80,
Inc. PF940C, 9mm Luger Caliber pistol with no serial number.
MONTANO then reached inside her black backpack and retrieved a
third firearm, a Harrington & Richardson Arms Co., Automatic
Ejecting Third Model, .38 S&W caliber revolver, serial number
35608.  A UC began to visually inspect the three firearms and
asked MONTANO if she brought the fourth firearm, which was a
"Draco" styled pistol.  MONTANO stated she did not have the

firearm with her, but that someone was bringing it and was not
far away. MONTANO also retrieved a brown paper bag from the
backpack. Inside of the paper bag was a clear plastic bag
containing approximately 456 gross grams of methamphetamine.[7]  A
UC then paid MONTANO $4,700 for the three firearms and one pound
of methamphetamine. MONTANO is seen on surveillance footage
holding money in her left hand and later putting her left hand
in her left rear jean pocket.

27.  MONTANO then exited the UC location.  The dark red
Honda Civic remained parked in the same position for the
entirety of the firearms and narcotics transaction.
Surveillance units saw MONTANO approach VIVAR, who remained in
the driver's seat, and immediately handed him a brown paper bag.
MONTANO was then seen reaching into her back, left jean pocket,
retrieve what appeared to be money, and hand the suspected money
over to VIVAR.  While still engaging in conversation with VIVAR,
MONTANO reached into the same pocket and handed VIVAR what
appeared to be more money.  MONTANO then walked away from the
dark red Honda Civic but remained standing in front of the UC
location for approximately ten minutes, before leaving entirely.

**E.   On June 15, 2023, MONTANO Sold Three More Firearms and
       Three Rounds of Ammunition to the UCs**

28.  Between June 14, 2023, and June 15, 2023, a UC and
MONTANO coordinated a fourth meeting, predominantly utilizing
the WhatsApp Messenger application.

---

[7] On or about July 6, 2023, the DEA Southwest Laboratory
analyzed the methamphetamine purchased on June 9, 2023, and
determined the substance purity to be 100% +/- 6%.

29.  Based on law enforcements' review of documented text messages and recorded phone calls and my conversations with the UCs, the following occurred:

30.  On or about June 14, 2023, a UC contacted MONTANO, via WhatsApp Messenger, to inquire if MONTANO had any firearms for sale.  MONTANO told a UC that she would send pictures throughout the day of firearms she had available. On that date, MONTANO sent a UC photographs depicting four firearms, including a "Draco" styled pistol, an AR-styled pistol, and two "Glock" styled pistols.  Later that day, MONTANO texted a UC that the supplier wanted a few hundred dollars more for the "Draco."  A UC explained to MONTANO that it would not be worth the purchase considering that he/she must pay for shipping across the border. MONTANO replied that she would still bring the firearm to the deal even if she didn't make any money off it.

31.  On or about June 15, 2023, a UC confirmed the firearms transaction with MONTANO.  MONTANO advised that she had the firearms and would be at the deal later that day.  On that same date, at approximately 2:10 p.m., a surveillance unit observed a black four-door Chrysler arrive and park directly outside the UC location.  Shortly after, surveillance agents saw a black four-door Hyundai park directly next to the black Chrysler. After the Hyundai arrived, surveillance units immediately noticed MONTANO exit the front passenger seat of the Chrysler, and VIVAR exited the driver's seat of the Chrysler.  Around the same time, surveillance units saw an unknown Hispanic male exit the rear driver's seat of the black Hyundai. Surveillance footage showed

that there was an unknown person in the driver's seat of the Hyundai. VIVAR and the unknown male walked over to the trunk of the black Hyundai.  VIVAR pointed to the inside of the trunk of the Hyundai.  The unknown Hispanic male then retrieved a long, brown Amazon box from the trunk of the black Hyundai. VIVAR then pointed to the Chrysler and the unknown Hispanic male placed the brown Amazon box in the rear seat of the black Chrysler.  All three individuals then entered the black Hyundai and drove away from the UC location, leaving the black Chrysler parked in the same position.

32.  On that same date, at approximately 2:47 p.m., the black Hyundai arrived back the UC location and parked in the same position as before. The unknown Hispanic male exited the black Hyundai, walked over to the rear driver's side of the black Chrysler, retrieved what appeared to be the same long, brown Amazon box, and placed it back in the trunk of the black Hyundai. During this time, VIVAR exited the front passenger seat of the black Hyundai and entered the driver's seat of the black Chrysler. The unknown Hispanic male then entered the front passenger seat of the black Chrysler.

33.  Shortly after, the black Hyundai entered through the bay door of the UC location and MONTANO was observed exiting the rear passenger seat, while carrying a black backpack, and walked to the trunk of the black Hyundai. A UC retrieved a long, brown Amazon box from the trunk of the black Hyundai and then walked over to the lounge area with MONTANO. Once in the lounge area, a UC retrieved two firearms from the long, brown Amazon box,

14

namely, a Del-Ton, Inc. DTI-15, 5.56x45mm caliber rifle, with
serial number B84122, and a ROMARM/CUGIR, Micro Draco 7.62x39mm
caliber pistol, with serial number 21PMD-25848. MONTANO then
retrieved a Smith & Wesson, SD9VE, 9mm luger caliber pistol,
with serial number FWY9323 from a black backpack and handed it
to a UC. A UC appeared to be performing a function test with the
firearm to see if the firearm was operable. While a UC was
inspecting the firearm, MONTANO made a phone call to an unknown
person. At this time, surveillance units saw VIVAR answer his
cellphone, while still sitting inside the black Chrysler,
outside the UC location. A UC then paid MONTANO $7,100 for three
firearms and three rounds of ammunition. MONTANO mentioned the
possibility of the next transaction, involving four additional
firearms.

    34.  MONTANO exited the lounge area, walked back to the bay
area, and entered the rear passenger side seat of the black
Hyundai. The black Hyundai then drove out of the UC location and
parked near the black Chrysler, which remained parked in the
same position for the duration of the controlled purchase. The
unknown Hispanic male exited the front passenger seat of the
black Chrysler and entered the front passenger seat of the black
Hyundai. MONTANO exited the rear passenger seat of the black
Hyundai and entered the front passenger seat of the black
Chrysler. Both vehicles drove away from the UC location shortly
after.

**F.    Subject Vehicles Present During Controlled Purchases**

35.    Throughout the investigation, law enforcement surveillance units identified four suspected subject vehicles to be associated with MONTANO and/or VIVAR.  Based on training and experience, it is common for firearms and/or narcotics traffickers to use multiple vehicles when trafficking firearms and/or narcotics.  This can often be used as a tactic to deter law enforcement detection.

**G.    Subject Devices Used by MONTANO**

36.    Throughout the investigation, law enforcement identified five separate phone numbers, believed to be used by MONTANO, that she used to communicate with a UC when coordinating narcotics and firearms transactions.  Based on training and experience, it is common for narcotics and/or firearms traffickers to use multiple phone numbers and/or cellular devices to conduct their trafficking.  This can often be used as a tactic to deter law enforcement detection.

**H.    After June 15, 2023, MONTANO Sent Pictures of Firearms to a UC**

37.    I know based on my conversations with officers and review of reports that on or about August 3, 2023, MONTANO contacted a UC via WhatsApp Messenger application, and sent photographs of what appeared to be a shotgun to a UC. Additionally, on or about October 30, 2023, MONTANO sent a photograph of what appeared to be a rifle to a UC. Further, on or about October 31, 2023, MONTANO sent a UC a photograph of what appeared to be three firearms.

**I.     In October 2023, MONTANO Offers to Sell Firearms to a UC and Schedules a Gun Buy at the UC location on November 7, 2023.**

38.   Per my conversations with a UC, on or about October 30, 2023, MONTANO contacted the UC by WhatsApp message from a new phone number, and identified herself as Reyna. MONTANO sent the UC a video of what appeared to be a rifle. She also sent him a message that it was $2,500 but nice. The following day MONTANO sent the UC a picture of what appeared to be three different firearms and prices for the guns.

39.   The UC told MONTANO that the UC wanted to buy two guns from her.  MONTANO and the UC made a plan for her to sell the UC the guns on November 7, 2023.  Special agents are planning to arrest MONTANO and VIVAR during the controlled purchase scheduled for November 7, 2023 (the "buy-bust").

**J.     VIVAR is a Convicted Felon**

40.   Based on information obtained from his criminal history report, VIVAR has been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:[8]

a.     On May 17, 2019, VIVAR was convicted of possession of a controlled substance for sale, in violation of California Health and Safety Code Section 11378;

b.     On June 10, 2019, VIVAR was convicted of possession of a controlled substance for sale, in violation of California Health and Safety Code section 11378.

---

[8] MONTANO is not a felon.

**K.      MONTANO and VIVAR Do Not Hold Federal Firearms License**

41.  On November 2, 2023, Industry Operations Investigator ("IOI") Alberto Gomez conducted a search of law enforcement databases and confirmed that MONTANO and VIVAR do not hold Federal Firearms Licenses ("FFL").  As such, MONTANO and VIVAR do not possess licenses to engage in the business of dealing in firearms.

## VII. TRAINING AND EXPERIENCE ON DRUG OFFENSES

42.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence and vehicles, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.  They also often use multiple vehicles while trafficking narcotics in effort to deter law enforcement.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate

19

on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VIII.   **TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

43.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in

places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices.

       b.    Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

       c.    Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these

21

photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

        d.   Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices.

        e.   Firearms traffickers often use vehicles to
transport their firearms to and from deals. They also often use
multiple vehicles while trafficking firearms in effort to deter
law enforcement.

### V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    44.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

        a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

        b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

45.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

47.  Based on my training, experience, and knowledge of this investigation, firearms and/or narcotics traffickers often use various telephone numbers while engaging in this business. During the investigation, MONTANO has used approximately five separate phone numbers to coordinate the controlled purchases with a UC.  Therefore, there is probable cause to believe that evidence of firearms and/or narcotics trafficking may be found on MONTANO's cellular device.

48.  Additionally, based on my training, experience, and knowledge of this investigation, firearms and/or narcotics traffickers use their vehicles to transport or hide contraband. Therefore, there is probable cause to believe that evidence of firearms or narcotics trafficking may be found in VIVAR's and/or MONTANO's vehicle at the time of arrest.

a.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MONTANO's and VIVAR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MONTANO's and VIVAR's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VI. CONCLUSION

49.   For all the reasons described above, there is probable cause to believe that MONTANO and VIVAR engaged in the business of dealing in firearms without a license, in violation of Title 18 U.S.C. §§ 922(a)(1)(A), §2(a). Further, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B of this affidavit, will be found on the persons of MONTANO and VIVAR, as further described above and in Attachments A-1 and A-2, to this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  6th   day of
November, 2023.


_____
HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE